## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____
EMILIO GIRON,                                        :
                                                     :
                        Petitioner,                  :        Civ. No. 17-4048 (MCA)
                                                     :
        v.                                           :
                                                     :
ATTORNEY GENERAL STATE OF NEW                        :        OPINION
JERSEY, et al.,                                      :
                                                     :
                        Respondents.                 :
_____              :

<u>**MADELINE COX ARLEO, U.S.D.J.**</u>

### I.        INTRODUCTION

Petitioner, Emilio Giron ("Petitioner" or "Giron") is a state prisoner proceeding *pro se*

with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  For the following

reasons, Petitioner's habeas petition is denied and a certificate of appealability shall not issue.

### II.       FACTUAL AND PROCEDURAL BACKGROUND

The factual background is taken from the New Jersey Superior Court, Appellate

Division's opinion from Petitioner's direct appeal.

> Together with the same three confederates, defendant participated
> in two separate episodes over a three-day period involving two
> different women whom they forced into their truck and proceeded
> to rape at knife point.  According to the State's proofs, on August
> 28, 1998, at 12:30 a.m., S.J. was at Elmwood Gardens on the
> corner of Elmwood Place and West Second Street in Plainfield.  At
> 1:00 a.m., she walked about a block away to a phone booth near a
> Getty gas station to call her boyfriend for a ride.  A white, two-
> door truck pulled up and a man exited to ask her for directions. S.J.
> was then grabbed from behind, and the assailant put a knife to her
> neck.
>
> S.J. was forced into the back seat area of the truck.  There were
> four Hispanic men in the truck, two in the front seat, and two in the
> back.  The man in the driver's seat, later identified as defendant,

was heavy set, with short, curly hair, and he told S.J. that they were from Mexico.  He drove the truck to a spot on Wiley Avenue, parked the car, then drove a few more blocks and parked again.  Then the two men in the back seat began to undress S.J.  One of the men in the back seat had a box cutter, and the man in the front passenger seat had a knife.  While her clothes were being pulled off, the driver told S.J. to perform oral sex on one man in the back seat and allow the other to have sex with her.  One of the men in the back seat brandished the knife while penetrating her.

The two men then switched places at the driver's instructions, with the men in the front seat.  When the two men in the front got into the back, the driver asked her to "suck his dick," which she did while the other man "put his dick in [her] butt."  Once each male ejaculated, they switched so that "the fat one, Mario, would put his dick in [her] butt[,]" while she performed fellatio on the skinnier man.  They both ejaculated and, although the driver never had a knife, the skinnier male who had initially accosted her did so.  S.J. recalled the driver spoke English well, and the others spoke only Spanish.  Throughout the rapes, the other men spoke Spanish to the driver, who then gave S.J. instructions in English.  S.J. recalled one man was called Edward, another Jose, and the driver, Mario.

After the rapes, the men gave S.J. her clothes, but refused to return her pocketbook.  When she was ordered out of the vehicle, the skinnier male with the knife pushed her with his hands against her back for her to run, before he returned to the truck.

S.J. then called the police and was taken to the hospital where she spoke with Detective Jorge Jiminez and gave a description of the truck and four individuals.  She described Mario, the driver, as heavyset with short, curly hair and the front seat passenger, who had initially accosted her with the knife, as skinny and short.  One of the backseat passengers was fat with long, curly hair, while the other male was short and skinny and had possessed a box cutter-type knife.

S.J. was treated at the hospital.  Semen was found on her shirt, semen and blood was found on her shorts, and blood was found in her rectal and vaginal swabs.

The second incident involved a woman named J.B. and occurred two days later on August 30, 1998.  J.B. worked as a prostitute and was walking on Richmond and East Front Streets in Plainfield at around 2:00 or 3:00 a.m. in search of drugs.  A white Blazer truck pulled alongside her and she recognized the driver, described as fat

with curly hair, as someone named Mario whom she went to junior-high school with. The men in the front seat propositioned her for prostitution. She agreed to have sex with both of them for $20.00.

When she entered the truck, J.B. found two more men in the back seat. As the truck drove off, she indicated she wanted more money for the other two men, and also asked for a cigarette. The driver then pulled into a nearby Shell gas station, exited the vehicle and entered the convenience store. At this time, the short Spanish male whom she was sitting next to pulled out a knife, put it against her neck and told her he would kill her.

When they drove off, she begged them not to kill her but was told to shut up, mainly by the driver. The truck eventually stopped about four blocks away in a dark area, at which time the men in the back removed her clothes while holding the knife to her neck. J.B. was forced to perform oral sex on all of the men, and had vaginal sex with two of them. It was "one right after the other." The driver was one of the two individuals who vaginally penetrated her. J.B. specifically remembers seeing the driver's face very clearly, noting, "I can always remember his face." At some point, before he had sex with J.B., the driver took the knife from one of the other men and placed it on the dashboard, saying no one was going to hurt her.

J.B. was forced out of the van still naked and the men threw her clothes at her. They kept her bag, however, which contained a phone, camera, and Sega Genesis. J.B. walked to the Shell gas station and called the police. Detective David Carmen responded, interviewed J.B., and took her to the hospital.

Later that day, Detective Jimenez learned of the second sexual assault involving a similar-type vehicle and similar descriptions of the perpetrators. He also learned one of the individuals involved in the second assault had gone to the Shell gas station/mini mart and purchased condoms before entering the vehicle and leaving. Jimenez went to the gas station on August 31 and obtained the surveillance video which depicted defendant buying condoms.

About a week later, J.B. accompanied Detectives Carmen and Brown around town and pointed out a two-door white Chevy Blazer as being similar to the vehicle she was raped in. Detective Carmen stopped the vehicle and was given permission by its owners to photograph it. Detective Carmen then scanned the photograph and broadcast it to the other units in the Plainfield

Police Department.  A few days later, Detective Carmen was driving in Plainfield with another officer when J.B. approached the patrol car.  J.B. told the officers that she had seen a truck similar to the one driven by the men who raped her and provided them with the license plate of that vehicle.

On September 13 or 14, Detective Wilson, aware of the cases Detectives Carmen and Jimenez were working on and knowing the description of the suspect vehicle, observed the vehicle and stopped it.  It was occupied by a heavyset, Hispanic male who provided Wilson with his driver's license in the name of Emilio Giron.  Wilson also recorded the license plate of the vehicle and defendant's residence.

As a result, Detective Wilson went to defendant's residence, and requested that he come to police headquarters to have his photo taken.  Defendant complied.  His photograph was included in an array that was shown to J.B. on September 17, at which time she positively identified defendant as one of her assailants and the driver of the vehicle.  When a similar array was shown to S.J. that same day, she also identified defendant as one of her assailants and the driver of the vehicle.  Defendant was arrested that evening based on these identifications.

In his statement to the police the next morning following *Miranda* warnings, defendant acknowledged being involved in both incidents.  He explained that he and his friends were returning from a night at a dancing club when they told him to find a prostitute.  When they saw a woman on the phone at the Getty gas station, defendant stopped the Chevrolet Blazer, which belonged to his wife, and the woman agreed to go for a ride.  While negotiating over price, "Eric (Quintanilla) got crazy and he put a knife at her throat."  He then told her she was going to have sex with all of them while he held the knife at her throat.  Defendant told Eric not to cut her or do anything stupid.  While he indicated "the other guys had sex with her[,]" he stated he did not have sex with her but rather "[s]he gave me a blow job."  Thereafter, they told her to get out of the car, during which time Oseas (Pons) took her out of the car and told her to run, after which they left.

The second incident also began as a search for a prostitute after a night of clubbing.  When the victim they eventually found suggested their offer was "too cheap[,]"  "Eric (Quintanilla) got crazy again and put the knife in her throat."  Defendant told him not to do anything stupid.  She began screaming not to kill her, and he tried to assure the woman they were not going to do anything to

> her.  Defendant then parked the car and, as Eric and Pons held
> knives, "we started having sex with her."  They told her to get out
> of the car, keeping her bag which contained a Game Boy and
> "some more stuff."  The other three men involved were Eric
> Quintanilla, Oseas (Pons) and a Honduran.

*State v. Giron*, No. A-6009-08T1, 2011 WL 6183472, at *1–4 (N.J. Super. Ct. App. Div. Dec.

14, 2011).

> Tried *in absentia* by a jury, defendant Emilio R. Giron was found
> guilty of two counts of aggravated sexual assault, *N.J.S.A.* 2C:14–
> 2(a)(5), (Counts four and ten); two additional counts of aggravated
> sexual assault, *N.J.S.A.* 2C:14–2(a)(4), (Counts five and eleven);
> two counts of sexual assault, *N.J.S.A.* 2C:14–2(c)(1), (Counts six
> and twelve); two counts of kidnapping, *N.J.S.A.* 2C:13–1(b),
> (Counts seven and thirteen); two counts of possession of a weapon
> for an unlawful purpose, *N.J.S.A.* 2C:39–4(d), (Counts eight and
> fourteen); two counts of weapon possession under manifestly
> inappropriate circumstances, *N.J.S.A.* 2C:39–5(d), (Counts nine
> and fifteen); and two counts of robbery, *N.J.S.A.* 2C:15–1, (Counts
> sixteen and seventeen).  At sentencing nine years later on March
> 24, 2009, the court imposed consecutive fifteen terms subject to
> eighty-five percent parole ineligibility on each of the kidnapping
> charges (Counts seven and thirteen).  The court then merged count
> six with count four; counts eight and nine with count five; count
> twelve with count ten; counts fourteen and fifteen with count
> thirteen; and count seventeen with count sixteen; and imposed
> concurrent thirteen-year terms on counts four, five, ten, eleven and
> sixteen, subject to the eighty-five percent parole bar, for an
> aggregate sentence of thirty years subject to the eighty-five percent
> parole disqualifier.

*Giron*, 2011 WL 6183472, at *1.

The Appellate Division affirmed on direct appeal except for a limited remand so that the

trial court could correct the judgment of conviction to reflect a fifteen-year sentence on the

kidnapping conviction in court thirteen.  *See id.*  The New Jersey Supreme Court denied

Petitioner's petition for certification on direct appeal.  *See State v. Giron*, 43 A.3d 1168 (2012).

Petitioner then filed a post-conviction relief ("PCR") petition in the New Jersey Superior Court.  Among the issues raised in that petition were the following ineffective assistance of counsel claims:

1. Failure to investigate whether the Getty gas station had surveillance video capturing the encounter between Petitioner and the victim to prove she got into the car willingly and never at knife point ("Claim I") (*see* ECF 7-7 at 7; ECF 7-10 at 3)

2. Failure to file a severance motion by May 1, 2000 ("Claim II") (*see* ECF 7-7 at 7; ECF 7-10 at 6)

3. Failure to present the affidavit of Eric Quintanilla where he admitted Petitioner never possessed a knife in the assaults ("Claim III") (*see id.* at 8)

4. Failure to present to the jury that Petitioner willingly went to the police station and had his picture taken and not asking the judge for a jury instruction on how the prosecution got a picture of Petitioner ("Claim IV") (*see id.* at 9)

Additionally, Petitioner sought a new trial based on newly discovered evidence from his co-defendant Pons.  Pons submitted an affidavit where he said that at no point in either incident did he see Petitioner commit any of the crimes.

The New Jersey Superior Court denied the PCR from the bench on January 2, 2014. (*See* ECF 24).  Petitioner appealed.  However, Petitioner admits he did not raise the four numbered claims outlined above in his appeal.  (*See* ECF 10).  Instead, he only raised the claim related to the Pons affidavit.  The Appellate Division affirmed the denial of this claim.  *See State v. Giron*, A-3264-13T3, 2015 WL 10436863 (N.J. Sup. Ct. App. Div. Mar. 10, 2016).  The New Jersey Supreme Court then denied Petitioner's petition for certification. *See State v. Giron*, 141 A.3d 298 (2016).

In June, 2017, this Court received Petitioner's *pro se* petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  (*See* ECF 1).  Petitioner raises the four numbered ineffective assistance of counsel claims ("Claims I-IV") that he raised in his PCR petition.  Respondents filed a response in opposition to the habeas petition.  (*See* ECF 7).  Respondents argue that Petitioner's claims are unexhausted and/or that they can be denied on the merits.  In reply, Petitioner concedes that his four claims are unexhausted, but he asserts that this lack of exhaustion should be excused.  (*See* ECF 10).

## III.    LEGAL STANDARD

An application for writ of habeas corpus by a person in custody under judgment of a state court can only be granted for violations of the Constitution or laws or treaties of the United States.  *See Engle v. Isaac*, 456 U.S. 107, 119 (1982); *see also Mason v. Myers* 208 F.3d 414, 415 n.1 (3d Cir. 2000) (citing 28 U.S.C. § 2254).  Petitioner filed this petition for writ of habeas corpus after April 24, 1996, thus, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. 104-132, 110 Stat. 1214 (Apr. 24, 1996), applies.  *See Lindh v. Murphy*, 521 U.S. 320, 326 (1997).  Under AEDPA, federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court.  *See* 28 U.S.C. § 2254(d).

A state prisoner applying for a writ of habeas corpus under § 2254 in federal court must first "exhaust the remedies available in the courts of the State," unless "(i) there is an absence of available State corrective process; or (ii) circumstances exist that render such process ineffective

to protect the rights of the applicant."  28 U.S.C. § 2254(b)(1).  A petitioner must exhaust state remedies by fairly presenting his federal constitutional claims to each level of the state courts empowered to hear those claims, either on direct appeal or in collateral post-conviction relief proceedings.  *See, e.g., O'Sullivan v. Boerckel*, 526 U.S. 838, 847 (1999) (announcing the rule "requiring state prisoners to file petitions for discretionary review when that review is part of the ordinary appellate review procedure in the State"); *see also* 28 U.S.C. § 2254(c) ("An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.").

> A petitioner can 'fairly present' his claims through: (a) reliance on pertinent federal cases; (b) reliance on state cases employing constitutional analysis in like fact situations; (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution; and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation.

*Nara v. Frank*, 488 F.3d 187, 198 (3d Cir. 2007) (citing *McCandless v. Vaughn*, 172 F.3d 255, 260 (3d Cir. 1999)) (footnote omitted).  "Even if a state court refuses the claim on procedural grounds, it is still exhausted as long as the state court had the opportunity to address it."  *Id.* (citing *Bond v. Fulcomer*, 864 F.2d 306, 309 (3d Cir. 1989); *Pursell v. Horn*, 187 F. Supp. 2d 260, 2288 (W.D. Pa. 2002)).

Despite the exhaustion requirement, "a federal court [may] deny an unexhausted claim on the merits 'if it is perfectly clear that the applicant does not raise even a colorable federal claim.'"  *Carpenter v. Vaughn,* 296 F.3d 138, 146 (3d Cir. 2002) (quoting *Lambert v. Blackwell,* 134 F.3d 506, 514–15 (3d Cir.1997) (construing 28 U.S.C. § 2254(b)(2))); *see* 28 U.S.C. § 2254(b) (2) ("An application for a writ of habeas corpus may be denied on the merits,

notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").

## IV.   DISCUSSION

Prior to analyzing the claims individually, this Court must address what standard of review to applies.  As noted above, Petitioner concedes in his reply brief that he failed to exhaust his state court remedies on the four claims he brings in his habeas petition because he did not raise them on appeal of his PCR petition.  Petitioner states that he would be barred by the state courts from trying to raise these claims in a second PCR petition by New Jersey Court Rule 3:22-12(a)(2) which states as follows:

> *Second or Subsequent Petition for Post-Conviction Relief.*
> Notwithstanding any other provision in this rule, no second or subsequent petition shall be filed more than one year after the latest of:
>
>> (A) the date on which the constitutional right asserted was initially recognized by the United States Supreme Court or the Supreme Court of New Jersey, if that right has been newly recognized by either of those Courts and made retroactive by either of those Courts to cases on collateral review; or
>> (B) the date on which the factual predicate for the relief sought was discovered, if that factual predicate could not have been discovered earlier through the exercise of reasonable diligence; or
>> (C) the date of the denial of the first or subsequent application for post-conviction relief where ineffective assistance of counsel that represented the defendant on the first or subsequent application for post-conviction relief is being alleged.

N.J. Ct. R. 3:22-12(a)(2).  According to Petitioner though, he can overcome the purported procedural default of his claims pursuant to *Martinez v. Ryan*, 566 U.S. 1 (2012).

This Court will decline to address whether Petitioner's claims are procedurally defaulted and Petitioner's corollary argument that he can show cause and prejudice to overcome the purported procedural default pursuant to *Martinez*.  Indeed, the New Jersey state courts have not addressed whether Petitioner's four ineffective assistance of counsel claims he raises here are procedurally defaulted.  Courts have noted that "the better practice allows a New Jersey court-not a federal court-the first opportunity to address the question of procedural default under New Jersey law." *Toulson v. Beyer,* 987 F.2d 984, 988 n.7 (3d Cir.1993)); *see also Baker v. Ricci,* No. 09–3654, 2013 WL 4833415, at *10–11 (D.N.J. Sept. 9, 2013).  This Court will follow that practice here.

Having side-stepped the procedural default issue for the time being, this Court will review Petitioner's claims on the merits to determine whether Petitioner has stated a colorable claim.

A. <u>Claim I</u>

In Claim I, Petitioner argues that counsel was ineffective because she failed to investigate the Getty gas station's surveillance video which would have purportedly showed that the victim entered the car willingly and not at knife point.  In *Strickland v. Washington,* 466 U.S. 668 (1984), the Supreme Court articulated the two-prong test for demonstrating when counsel is deemed ineffective.  First, the petitioner must show that considering all the circumstances, counsel's performance fell below an objective standard of reasonableness.  *See id.* at 688; *see also Grant v. Lockett*, 709 F.3d 224, 232 (3d Cir. 2013) (noting that it is necessary to analyze an ineffectiveness claim considering all circumstances) (citation omitted).  A petitioner must identify the acts or omissions that are alleged not to have been the result of reasonable professional judgment.  *See Strickland*, 466 U.S. at 690.  Under this first prong of the *Strickland*

test, scrutiny of counsel's conduct must be "highly deferential." *See id.* at 689.  Indeed, "[c]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690.  The reviewing court must make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689.  If counsel makes "a thorough investigation of law and facts" about his plausible options, the strategic choices he makes accordingly are "virtually unchallengeable." *Gov't of Virgin Islands v. Weatherwax*, 77 F.3d 1425, 1432 (3d Cir. 2006) (citing *Strickland*, 466 U.S. at 690-91).  If, on the other hand, counsel pursues a certain strategy after a less than complete investigation, his choices are considered reasonable "to the extent that reasonable professional judgments support the limitations on investigation." *Rolan v. Vaughn*, 445 F.3d 671, 682 (3d Cir. 2006) (citing *Strickland*, 466 U.S. at 690-91).

The second prong of the *Strickland* test requires the petitioner to affirmatively prove prejudice.  *See* 466 U.S at 693.  Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.  A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.*; *see also McBridge v. Superintendent, SCI Houtzdale*, 687 F.3d 92, 102 n.11 (3d Cir. 2012).  "This does not require that counsel's actions more likely than not altered the outcome, but the difference between *Strickland's* prejudice standard and a more-probable-than-not standard is slight and matters only in the rarest case. The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 111-12 (2011) (internal quotation marks and citations omitted).

"With respect to the sequence of the two prongs, the *Strickland* Court held that 'a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies…. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice... that course should be followed.'" *Rainey v. Varner*, 603 F.3d 189, 201 (3d Cir. 2010) (quoting *Strickland*, 466 U.S. at 697).

As noted above, Petitioner raised Claim I only before the New Jersey Superior Court and not beyond. That court analyzed this claim as follows:

> Defendant herein submits that the trial counsel -- counsel erred in not conducting her own independent investigation of whether surveillance videos captured the encounter between the victim and the defendant. Defendant claims it would show that the victim voluntarily entered the vehicle. During the trial there was video viewed by trial counsel that showed defendant purchasing condoms at the Shell station on the evening of August 30, 1998. There's no evidence that such a video beyond one viewed the parties even existed, and as discussed, counsel's performance will not be deemed ineffective for choice in strategy.

> In this case there is an issue as to whether when the kidnapping and rape began whether it was outside or inside of the vehicle. Nevertheless, according to the overwhelming evidence, it did occur inside the vehicle and in fact defendant confessed in a sworn statement to police that once the victims were inside the vehicle they were held at knife point unable to leave.

> Regardless of how the victims initially entered the vehicle therefore and what the video would show, the record is quite clear, through the testimony of the victim and defendant's own sworn statement, that they were unable to exit upon their own free will, even if perhaps they entered the car under their – their own free will. Accordingly, the argument is completely without merit I find.

(ECF 7-24 at 9).[1]

In a failure to investigate ineffective assistance of counsel claim:

> [T]o show prejudice, a defendant basing an inadequate assistance claim on his or her counsel's failure to investigate must make a comprehensive showing as to what the investigation would have produced. The focus of the inquiry must be on what information would have been obtained from such an investigation and whether such information, assuming admissibility in court, would have produce a different result.

*United States v. Askew*, 88 F.3d 1065, 1073 (D.C. Cir. 1996) (internal quotation marks and citations omitted); *see also United States v. Lathrop*, 634 F.3d 931, 939 (7th Cir. 2011) ("When a petitioner alleges that counsel's failure to investigate resulted in ineffective assistance, the petitioner has the burden of providing the court with specific information as to what the investigation would have produced.") (citation omitted); *Untied States v. Garvin*, 270 F. App'x 141, 144 (3d Cir. 2008) (failure to investigate claimant must show that but for the inadequate investigation, there is a reasonable probability exculpatory evidence would have been found which would undermine confidence in his conviction).

This Court has reviewed the relevant trial evidence. The relevant victim testified as follows:

1. She was grabbed from behind and someone put a knife to her neck (*see* ECF 7-20 at 35)

2. She was then told to get in the truck (*see id.* at 36)

3. The perpetrators then drove away from the gas station with the victim (*see id.* at 39)

4. The driver told the victim to "suck my man's dick" (*see id.* at 42)

---

[1] This Court gives no deference to the Superior Court's opinion in this or any other of Petitioner's claims as they are all unexhausted. The portions of that opinion cited are provided only as background to Petitioner's claims.

5. Weapons were displayed during the encounter at this point, including a box cutter (*see id.* at 44)

6. The victim then performed oral sex on one of her captures while another one inserted his penis into her vagina (*see id.* at 47-48)

7. The same thing was repeated with the men in the front seat after the two men in the back seat ejaculated with the driver making the victim perform oral sex on him (*see id.* at 51-53)

8. The victim testified that the driver performed anal sex on her (*see id.* at 60)

9. Several days later, the victim identified Petitioner as the driver of the assault after seeing his picture by police (*see id.* at 65-66)

Additionally, at trial, the police detective confirmed that the victim had positively identified Petitioner as one of her attackers.  (*See id.* at 160).  The detective then testified that Petitioner admitted during interrogation that he was involved in the incidents that he was charged with. (*See id.* at 172).  Petitioner admitted to police that Eric Quintanilla put a knife to the victim's throat and told her she was going to have sex with them.  (*See id.*)  Petitioner then also admitted that the victim gave him oral sex.  (*See id.*)  Finally, Petitioner admitted to police that they drove around for several minutes before the assault took place.  (*See id.* 175).

This strong trial evidence against Petitioner leads this Court to conclude that Petitioner has failed to show *Strickland* prejudice on Claim I.  Indeed, the victim's testimony and Petitioner's own statements to police indicate that weapons were used, and the assaults occurred away from the Getty gas station.  Thus, any purported Getty gas station surveillance tape would have had little relevance regarding whether weapons were used and that the assault occurred. Assuming *arguendo* that a surveillance video would have shown the victim voluntarily getting

14

into the vehicle, it does nothing to show that the outcome of the proceeding would have been different given the other damaging testimony against Petitioner.  Accordingly, for these reasons, Claim I is denied.[2]

B. <u>Claim II</u>

In Claim II, Petitioner asserts trial counsel was ineffective when she failed to move for a severance motion by May 1, 2000.  The New Jersey Superior Court analyzed this claim as follows:

> With -- the second argument is that the complaint that was considered by the trial court, as well as the Appellate Division, about the timely -- failure of counsel to timely file a severance motion.  Defendant asserts that he was denied effective assistance of counsel on the basis that trial counsel failed to file a timely severance motion.
>
> Defendant initially moved for severance on June 6, 2000, notwithstanding a trial memorandum dated February 28, 2000, which mandated a pretrial memoran-- pretrial motion deadline of May 1, 2000.
>
> The trial court, nevertheless, considered the motion and denied it both on procedural and substantive grounds.  The matter was also then addressed by the Appellate Division in their review of the matter, and they also found that there was no meritorious motion for severance that could have been -- that -- that was considered by the Court and the trial court was right in denying the severance motion.
>
> Rule 3:7-6 allows for a joinder of multiple charges in a single indictment when the charges are of the same or similar character or based upon the same act or transaction or on two or more acts or transactions connected together constituting parts of a common scheme or plan.

---

[2] It is also worth noting that besides Petitioner's self-serving statements, he has not provided this Court with the actual surveillance video.  This Court then cannot make any conclusion that had counsel investigated the surveillance video issue, it would have depicted the initial encounter between the victim, Petitioner and his codefendants at the Getty gas station as Petitioner describes in his habeas petition.

> Pursuant to Rule 3:15-2b courts may order separate trials of counts
> of an indictment if it appears that a defendant is prejudiced by
> permissible or mandatory joinder of offenses or of defendants in
> indictment, essentially if joinder will prevent - deprive him of a
> fair trial, STATE V. MODELL, 260 N.J. Super. 227, cert. denied
> 133 N.J. 432.
>
> It is the defendant's burden to show he was prejudiced by the
> joinder.  In this case a consideration -- I should say -- let me say a
> consideration for whether multiple offenses should be tried
> together is whether assuming the charges were tried separately
> proof of one charge would be admissible in proof -- in the trial of
> the other charge.  New Jersey Rule of Evidence 404(b), often
> referred to as prior bad acts evidence, STATE V. PITTS, 116 N.J.
> 580.
>
> In this case obviously first of all it's been considered by the trial
> court, it's been considered by the Appellate Division.  The
> Appellate Division found that the severance would have been
> inappropriate as decided by the trial Court.  Clearly even if the
> case had been severed, the 404(b) would have brought the
> evidence in, anyway, so it's impossible for the Court to even begin
> to consider that trial counsel was ineff-- was ineffective in this -- in
> this case

(ECF 7-24 at 9-10).

Petitioner failed to show he was prejudiced by counsel's failure to seek severance on or

before May 1, 2000.  As the Superior Court accurately noted, Petitioner's request for severance

was denied both procedurally (*see* ECF 7-10 at 26-28) and substantively (*see id.* at 31-33) by the

trial court.  Subsequently, on direct appeal, the Appellate Division even noted that the trial court

properly denied Petitioner's severance motion on the merits.  *See Giron*, 2011 WL 6183472, at

*5 ("No undue prejudice befell defendant from joinder of these offenses because had there been

separate trials, we are satisfied that evidence of each sexual assault incident would have been

admissible in both proceedings under the standard set forth in *State v. Cofield,* 127 *N.J.* 328

(1992).").

Given that the state courts permitted Petitioner to bring a motion to sever and it was decided on the merits, notwithstanding its purported untimeliness, this Court fails to see how Petitioner can prove that he was prejudiced by counsel's failure to bring the motion on May 1, 2000, as opposed to June, 2000, right before trial.  Accordingly, Claim II is denied.

C.  Claim III

In Claim III, Petitioner argues that counsel was ineffective when she failed to present the affidavit of one of Petitioner's co-defendants, Eric Quintanilla, at trial.  The New Jersey Superior Court denied this claim as follows:

> Defendant also submits that trial counsel erred by failing to present the affidavit of co-defendant, Eric Quintanilla, stating defendant did not possess a knife used in the two assaults. This argument is also without merit I find.
>
> Even though the affidavit was not presented, and I don't know how an affidavit would have come in necessarily, it would have been hearsay evidence, but even if the testimony was presented, there was still ample testimony from the victims, as well as the defendant himself, that the knife was brandished and the victims were held at knife point throughout both assaults, including when the victim were assaulted by defendant personally.
>
> There was never any evidence that defendant was the knife wielder of the incident and so while he may not have personally held the knife up to the victims' neck, he essentially affirmed the actions taken by the co-defendants by engaging in the sexual assaults and in fact directed the victim throughout, as he was the only one who according to the victim spoke English clearly.
>
> Only when the knife was pressing against the victim to a point where it interfered with their ability to commit the sexual assaults on her did defendant remove the knife from his co-defendants. The victims did not testify that they saw defendant with a knife in his hand, except when J.D. indicated defendant moved her from the back of the vehicle to the front.
>
> Before deliberating the jury was given instructions defendant can only be found guilty if he shared the purpose of the weapon, so the jury was adequately charged.

> The question posed to the jury was whether defendant shared the
> purpose of that weapon for which it was present.  They were also
> given the definition of constructive possession, which also could
> be used as a basis for guilt.  And the cite for these portions of the
> transcript, Transcript 5, 133 to 130-23, also 136-9 to 137-1.
>
> The fact that the knife was in the possession of someone else did
> not remove culpability from the defendant, as the jury correctly
> found in this case, and the affidavit did more than state that the
> defendant did not have physical possession of the weapon, which
> has been already testified by the victims throughout the trial.
>
> Accordingly, the trial counsel was not ineffective in failing to
> attempt to admit this – this affidavit.

(ECF 7-24 at 10-11).

Under New Jersey law, hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." N.J. R. Evid. 801(c).  "Because hearsay is considered "untrustworthy and unreliable," *State v. White,* 158 N.J. 230, 238, 729 A.2d 31 (1999), it is generally inadmissible at trial.  [N.J. R. Evid.] 802."  *One Step Up, Ltd. v. Sam Logistic, Inc.*, 17 A.3d 826, 831 (N.J. Sup. Ct. App. Div. 2011).

Quintanilla's affidavit would have been inadmissible hearsay as it constituted an out-court-statement by a witness being offered into evidence to help prove the truth of the matter asserted; *i.e.*, that Petitioner did not possess a knife during the assaults.  Petitioner's counsel though cannot be deemed ineffective for failing to attempt to introduce inadmissible hearsay evidence.  *See Mayfield v. United States*, No. 11-2950, 2012 WL 664806, at *6 (D.N.J. Feb. 29, 2012) (counsel not ineffective for failing to introduce inadmissible hearsay statements).

Even if the affidavit was not inadmissible hearsay, Petitioner still fails to show that he was prejudiced by counsel's failure to seek its admission at trial.  Indeed, given the evidence

produced at trial from the victims as well as Petitioner's own statements to police, it is unclear

how this evidence would have helped Petitioner's case, given that there was no testimony that

Petitioner was one that wielded a knife.  Accordingly, Petitioner is not entitled to relief on Claim

III.

    D.  <u>Claim IV</u>

    In Claim IV, Petitioner asserts counsel was ineffective when she failed to present to the

jury that Petitioner had gone willingly to the police station to take a picture.  The New Jersey

Superior Court analyzed this claim as follows:

> Defendant also submits that he was denied effective assistance of
> counsel by failing to introduce evidence that he willingly went to
> the police station to be photographed, which is true, but there's
> absolutely no significance I find on the outcome of this case
> whether the fact that before he was charged (indiscernible) decided
> to cooperate with the police and -- and go down and have his
> photograph taken, which was later used in the array, which was
> identified by the victims, has absolutely just such minor relevance.
>
> And when you stack it against the overwhelming evidence, the
> testimony of the victims, the identity, the sworn confession in this
> case, there's no way that -- that the failure to in—to introduce that
> evidence meets the STRICKLAND standard for ineffective
> assistance of counsel.

(ECF 7-24 at 11-12).

    This Court concurs with the reasoning of the New Jersey Superior Court.  Given the

strong evidence produced at trial against Petitioner, this Court fails to see how counsel

presenting to the jury that Petitioner willingly let the police take his picture would have changed

the outcome of his trial to a reasonable probability.  Additionally, it is worth noting that this

evidence was in fact produced at trial for the jury.  Indeed, a detective testified that Petitioner

came to police headquarters and agreed to permit police to take a photograph that was to be used

to either qualify or disqualify him as a suspect in the case.  (*See* ECF 7-21 at 132-34).

Petitioner also appears to argue within Claim IV that counsel was ineffective for failing to have the trial judge instruct the jury how the police obtained his picture.  During the jury charge conference, the trial judge inquired whether defense counsel wanted him to read to the jury the "photo identity, police photo information" instruction which the judge explained would tell the jury the different ways police can come into possession of a photo.  (*See* ECF 7-21 at 176).  Petitioner's trial counsel told the judge she did not want that charge given.  (*See id.*).

Petitioner is not entitled to relief on this ineffective assistance claim for a few reasons. First, counsel's decision to decline the instruction could be viewed as a reasonable trial strategy by not emphasizing the photo which both victims positively identified as one of the assailants. Additionally, and perhaps more importantly, as previously noted, this is not a case where the jury was unaware where the police obtained a copy of Petitioner's photo used in the photo array. Indeed, the jury was aware through the detective's testimony that Petitioner agreed to come to police headquarters and agreed to permit the police to take his picture.  (*See* ECF 7-21 at 132-34).  Thus, this Court fails to see how Petitioner was prejudiced by counsel's failure to request a jury instruction that police could obtain a photograph in different ways given that the jury was already aware how the police obtained Petitioner's photograph through trial testimony.

Finally, Petitioner also argues that counsel failed to present any evidence of Petitioner's innocence.  (*See* ECF 1-1 at 8).  Besides the claims outlined and denied above, Petitioner provides no further specific evidence that counsel should have presented in his defense at trial. Petitioner's vague and conclusory allegation within Claim IV that counsel failed to present any evidence of Petitioner's innocence "cannot meet his burden to show that counsel made errors so serious that his representation fell below an objective standard of reasonableness[.]" *Zettlemoyer v. Fulcomer*, 923 F.2d 284, 298 (3d Cir. 1991).  Accordingly, this argument lacks merit as well.

Therefore, for the foregoing reasons, Petitioner fails to show that he is entitled to federal habeas relief on any of his arguments within Claim IV.  Thus, Claim IV is denied.

## V.   CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254.  A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  Applying this standard, this Court finds that a certificate of appealability shall not issue in this case.

## VI.   CONCLUSION

For the foregoing reasons, the habeas petition is denied and a certificate of appealability shall not issue.  An appropriate order shall be entered.

DATED:  June 15, 2020

HON. MADELINE COX ARLEO
United States District Judge